STATE OF NORTH CAROLINA v. COREY DORAN JONES

No. COA02-909

(Filed 17 June 2003)

**1. Jury; Witnesses— witness questioned directly by jurors— no prejudice**

There was no prejudice in allowing jurors to ask a witness about images in crime scene photographs even though the court did not follow the better practice of receiving written questions from the jury, holding a bench conference for objections, and reading the questions to the witness. Defendant did not carry his burden of proving that the questions and responses were so prejudicial that they resulted in an adverse verdict, particularly in light of the other strong evidence of guilt.

**2. Drugs— forfeiture of funds—no conviction of Controlled Substances Act offense**

A forfeiture of illegal drug money was vacated where defendant was not convicted of any crime described in N.C.G.S. § 90-112(a)(2).

Appeal by defendant from judgments entered 1 February 2002 by Judge B. Craig Ellis in Cumberland County Superior Court. Heard in the Court of Appeals 14 May 2003.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General James M. Stanley, Jr., for the State.*

*Richard G. Roose for defendant-appellant.*

MARTIN, Judge.

Defendant was charged with the first degree murder of Anthony Mahoney, conspiracy to commit robbery with a dangerous weapon, and first degree burglary. A jury convicted him of second degree murder, conspiracy to commit robbery with a dangerous weapon, and first degree burglary. He appeals from the judgments entered upon the verdicts.

The State's evidence at trial tended to show that Mahoney was shot to death at his home in Fayetteville sometime between 10:00 p.m. and midnight on the evening of 26 January 1998. Nyron Pitterson, a friend of Mahoney's who was staying with him at the time, testified that he was in the living room when he heard a loud knock on the front door. Pitterson looked through the peep hole and recognized defendant and his cousin, both of whom he had met previously. Pitterson informed Mahoney, who was in a bedroom, that defendant and his cousin were at the door. Mahoney went to the door and Pitterson went into the kitchen. Pitterson heard Mahoney ask who was at the door and defendant respond "Corey." Pitterson heard the door open and immediately heard gunshots. Upon hearing the gunfire, Pitterson ran through a glass door in the kitchen. Pitterson testified that someone was firing at him as he ran through the backyard, and that the shooter chased him through the backyard, through a swamp area, and into an adjoining cul-de-sac. Pitterson was screaming for help, and a neighbor opened a door, let him inside, and contacted police.

Corporal J.B. Thomas testified that he and other officers entered Mahoney's house, which had been ransacked, and discovered

Mahoney, who appeared to be deceased. A forensic pathologist testified that Mahoney had been shot three times and died as a result of two gun shot wounds, one to the abdomen and one to the chest. Pitterson told police that defendant and his cousin had entered Mahoney's house and killed him, and he identified the two assailants from a photographic line-up. Pitterson told police he knew defendant lived with his girlfriend, Tomekia Burgos. A police K-9 team was used to track the perpetrators' trail and led police to a nearby street where police observed a vehicle which had been left unattended. A registration check revealed the vehicle was registered to Burgos.

Burgos testified for the State that she and defendant lived together at the time of the shooting. On the night of the shooting, defendant was driving her black 1994 Acura. Defendant was supposed to pick Burgos up from work when her shift ended at 11:40 p.m., but he never came. Burgos got a ride home from work with her brother sometime after midnight. Upon arriving home, Burgos received a call from Carlos Palmer, Mahoney's brother. Palmer was upset, and told Burgos he believed defendant had killed Mahoney. After hanging up the telephone, Burgos discovered a note defendant had left for her on the dresser. In the note, defendant wrote that he and his cousin "got to get [sic] ready to hit these niggas. You know who. I gotta pay the [sic] bills, and deez niggas don't realize [sic] I ain't on my feet now so I got to get their cash." Burgos then checked to see if her gun was behind the door where she usually stored it; it was not. Burgos testified the gun was behind the door when she left for work earlier that day.

Burgos further testified that she discovered approximately $2,000 in cash on the dresser along with a note from defendant that it was to be used as bond money if something were to happen. Burgos testified that the money was defendant's, that he made money selling drugs, and that he bragged to her about how much money he made selling drugs. She stated that defendant had not been employed since May 1997 and would not have received that amount of money through any legitimate business. Burgos testified defendant had been involved in selling drugs since June of 1997, that he sold crack cocaine, and that she had observed the drugs in her home.

Defendant brings forward only two of his six assignments of error contained in the record on appeal. The four assignments of error not addressed in defendant's brief are deemed abandoned. *See* N.C. R. App. P. 28(a), 28(b)(6).

[1] In his first argument, defendant asserts he is entitled to a new trial because the trial court erroneously permitted jurors to ask questions of a witness for the State. During the testimony of Margaret Godwin, a member of the crime scene unit of the sheriff's department, the State introduced several photographs of the crime scene taken by Godwin for the purpose of illustrating her testimony. Godwin was in the process of describing a photograph of Mahoney's body when the following colloquy transpired with a juror:

THE WITNESS: This is the victim's chest.

JUROR #9: Okay. That's the way you had it turned?

THE WITNESS: Yes.

JUROR #9: So that's like turned upside down?

THE WITNESS: No, this is the floor right here.

JUROR #9: Right.

THE WITNESS: This is chest sideways.

JUROR #9: Where would the victim's head be?

THE WITNESS: Up here.

JUROR #9: Okay.

THE WITNESS: The shirt was pulled down.

JUROR #9: Okay.

Shortly thereafter, jurors questioned Godwin about a photograph of the outside of the sliding glass door:

JUROR #10: Is the part right here, this here, is this the part the glass came out of?

THE WITNESS: Yes, ma'am.

JUROR #9: Now, you told me that this is the entire frame which would have stood here, or is it from this—I mean—

THE WITNESS: This is the frame that was laying out. There's a screen frame and a glass frame from this side of the door.

JUROR #9: I'm trying to get some perspective. Is this one side of a sliding glass door?

THE WITNESS: Yes.

JUROR #9: Okay.

THE WITNESS: This is both sides of the door.

JUROR #9: Yes, but this—

THE WITNESS: This came from this side.

JUROR #9: Thank you.

The same jurors further questioned Godwin about a photograph of the front door:

JUROR #10: That's from the outside or the inside?

THE WITNESS: Outside. Around the wooden door frame area.

JUROR #9: So if I'm getting this right— so if this is a duplex, when you're facing that door, there's another door directly behind you?

THE WITNESS: Yes.

JUROR #9: Okay.

THE WITNESS: I'm not exactly sure if that door is directly opposite the other door or not. I do know that they had shared steps, and you had to go up on the deck and turn left to go into that apartment.

JUROR #9: Okay.

JUROR #11: Can I ask a question? Do these bullet holes appear to be from the outside going in or from the inside coming out?

. . .

THE WITNESS: In my opinion, they're from the outside going in.

Juror number 9 continued to question Godwin about a photograph of the bathroom depicting a bullet hole:

JUROR #9: This the continuation of the hole that was three foot, eight inches above in the hallway? Is this the same—is that where you say it came?

THE WITNESS: In my opinion, it possibly could, but I can't swear to it—

JUROR #9: All right.

THE WITNESS: —because that hole was so much further down.

JUROR #9: Right. So this is up higher?

THE WITNESS: It's at the top of the sink, right—this is the back side of the sink, is that portion going right across there, and the bullet hole is just above it at an angle going into the wall.

Finally, the following colloquy took place regarding a photograph of the front door:

JUROR #9: Sir, the previous photo with the blood on the back of the door, would that be in the back of that front door?

THE WITNESS: It would be the back of this front door right here.

JUROR #9: The door you go into?

THE WITNESS: Yeah. If the door was closed and you were standing outside, you'd see it this way. If the door was closed and you were standing inside, this is what you would see.

JUROR #9: It's on the inside of the front door?

THE WITNESS: It's on the inside.

JUROR #9: Thank you.

Defendant did not object to any of the jurors' questions.

In *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790 (1987), the Supreme Court observed that the issue of jurors questioning a witness is rare. The Court noted that in its one prior case addressing this issue, it held such questioning did not constitute error:

"There is no reason that occurs to us why this [juror questioning of a witness] should not be allowed in the sound discretion of the Court, and where the question asked is not in violation of the general rules established for eliciting testimony in such cases. This course has always been followed without objection, so far as the writer has observed, in the conduct of trials in our Superior Courts, and there is not only nothing improper in it when done in a seemly manner and with the evident purpose of discovering the truth, but a juror may, and often does, ask a very pertinent and helpful question in furtherance of the investigation."

*Id.* at 725, 360 S.E.2d at 794 (quoting *State v. Kendall*, 143 N.C. 659, 663, 57 S.E. 340, 341 (1907)). The Supreme Court further observed that many courts have agreed that such questioning is within the trial

court's sound discretion. However, the Court also considered concerns expressed by other courts, including that jurors' unfamiliarity with the rules of evidence could result in prejudicial questions, and that counsel "is placed in the untenable position of having to choose between not objecting and letting the possibly prejudicial testimony in or objecting to the question and risking offending the juror." *Id.* at 726, 360 S.E.2d 794. Our Supreme Court concluded that while *Kendall* remains good law, the better practice would be for jurors to submit written questions to the court, for the court to hold a bench conference to rule on any objections outside the presence of the jury, and for the court to read jurors' questions to the witness. The Court further held that counsel is not required to object at trial to jurors' questions in order to preserve the issue for appeal.

Nevertheless, the Court held in *Howard* that the defendant was not entitled to a new trial based on a juror posing several questions to a witness about the technique used in drawing blood for purposes of determining alcohol content. The Court rejected the defendant's claim that the trial court had erred in permitting the questioning, noting the questions were posed in the context of potentially confusing testimony about medical terminology, that "the questions by the juror were proper since the apparent purpose of the questioning was for clarification of the medical procedures used in this case," and that the trial court ensured that the juror's questions were limited to clarification of the witness' testimony. *Id.* at 728, 360 S.E.2d at 796.

Although the trial court in the present case did not follow the procedure of having jurors submit written questions, as described in *Howard*, we discern no abuse of discretion in allowing the questioning since the jurors' questions were posed solely to clarify the potentially confusing images depicted in the crime scene photographs. Even assuming, as defendant asserts, that Godwin's opinions that the bullet holes originated outside the residence and that a bullet hole in the bathroom was a continuation of a hole from the hallway were "potentially objectionable," defendant has failed to carry his burden of establishing that the jurors' questions and Godwin's responses were so prejudicial that they resulted in an adverse verdict, particularly in the light of the other strong evidence presented as to defendant's guilt. *See* N.C. Gen. Stat. § 15A-1443(a) (defendant must carry burden of proving outcome of trial would have been different but for alleged error). This assignment of error is overruled.

[2] In his final argument, defendant contends the trial court erred by ordering forfeiture of the money seized from Burgos' apartment as

illicit drug money pursuant to the provisions of G.S. § 90-112(a)(2). That statute subjects to forfeiture: "All money, raw material, products, and equipment of any kind which are acquired, used, or intended for use, in selling, purchasing, manufacturing, compounding, processing, delivering, importing, or exporting a controlled substance in violation of the provisions of this Article." N.C. Gen. Stat. § 90-112(a)(2) (2003). We are constrained to agree with defendant.

This Court has held, in several cases, that the mere possession of a sum of money along with, or in proximity to, the possession of a controlled substance does not subject the money to forfeiture absent evidence that the money was "acquired, used or intended for use" in violation of the Controlled Substances Act. *See State v. Fink*, 92 N.C. App. 523, 375 S.E.2d 303 (1989); *State v. Teasley*, 82 N.C. App. 150, 346 S.E.2d 227 (1986), *appeal dismissed and disc. review denied*, 318 N.C. 701, 351 S.E.2d 759 (1987); *State v. McKinney*, 36 N.C. App. 614, 244 S.E.2d 455 (1978). More recently, in *State v. Johnson*, 124 N.C. App. 462, 478 S.E.2d 16 (1996), *cert. denied*, 345 N.C. 758, 485 S.E.2d 304 (1997), this Court noted that G.S. § 90-112(a)(2) is a criminal, or *in personam*, forfeiture statute which requires that the State prove the guilt of the property's owner beyond a reasonable doubt. In *Johnson*, the defendant, though found guilty of possession of cocaine, was acquitted of possession of cocaine with intent to sell or deliver. Declaring that "[c]riminal forfeiture, therefore, must follow criminal conviction," the *Johnson* court set aside the forfeiture of the money seized from the defendant's person because the forfeiture did not follow a conviction of any of the acts described in G.S. § 90-112(a)(2). *Id.* at 476, 478 S.E.2d at 25.

Following *Johnson*, we interpret the statute to require that the conviction of the property's owner be related to one of the acts described therein, i.e., "selling, purchasing, manufacturing, compounding, processing, delivering, importing, or exporting a controlled substance in violation of the provisions of [the Controlled Substances Act]." In the present case, defendant was not convicted of any crime related to the Controlled Substances Act, and specifically, none of the acts described in G.S. § 90-112(a)(2). Therefore the money found in Burgos' apartment was not subject to forfeiture under the provisions of that statute and the order of forfeiture must be vacated. Though the State suggests in its brief that the money should be subjected to other monetary assessments imposed upon defendant or to the possibility of seizure by federal authorities pursuant to 21 U.S.C. § 881, we, as did the *Johnson* court, decline to

address the trial court's authority to do so, as the question has not properly been put before us.

No error in the trial; order of forfeiture vacated.

Judges HUNTER and GEER concur.